Thank you all for being here. Judge Grant and I are very pleased to be sitting with Judge Harvey Schlesinger, who is a district court judge in the Middle District of Florida, sitting by designation with us. He'll be joining us for two days this week, and we thank him for being willing to come up here and help. So let me start with the first case, United States of America v. Jim C. Beck, No. 21-13582. Mr. Grubman, you have reserved three minutes for rebuttal, and Mr. Treanor, you will get started after he has done his initial remarks. Mr. Grubman, you may proceed when you are ready. Mr. Grubman Thank you, Judge. Thank you, Your Honors, and may it please the Court. My name is Scott Grubman, and I represent the appellant, Jim Beck, in this case. Mr. Beck raised numerous issues on appeal. For the sake of time, I obviously can't get into all of them, although I could answer any question that he asked on any of them. But with the Court's indulgence, I'd like to start with the jury instruction issue. The issue there is whether the scheme to defraud jury instruction that was given to the jury was legally erroneous. At trial, the district court judge followed the Eleventh Circuit pattern jury instructions, and that's one thing I want to say up front. This is part of the pattern jury instructions, but as Your Honors know, the pattern jury instructions themselves state that just because there is language in the pattern jury instructions does not mean that the Eleventh Circuit approves of that language, and it has to be viewed on a case-by-case basis. The language that we have here is the definition of scheme to defraud, which was defined as any plan or course of action intended to deceive or cheat someone on their property using false or fraudulent pretenses, etc. That is contrary to the law of this Circuit and the law of the United States. In the Takalov case, which is the Eleventh Circuit case, of course, from 2016, this Circuit said that in order for a defendant to be convicted of ill or wire fraud, the government must prove beyond a reasonable doubt that the defendant intended to deceive and cheat. Cheat means take something of value. But you know we look at the jury instructions as a whole, and the district court also delivered explicitly stated that proving intent to deceive alone without the intent to cause loss or that we are left with a substantial and ineradicable doubt as to whether the jury was properly guided by the instructions. So that second part is absolutely a correct statement of the law, and I will acknowledge that. So what we have then is an inconsistency, in fact, more specifically, a contradiction. And the United States Supreme Court in Francis v. Franklin, which we cite in our brief from 1985, tells this Court exactly what to do under those circumstances. And with the Court's holding in that case, which in that case, by the way, is similar to this case in that there was a jury instruction where part of it was incorrect, and then later in the jury instructions there was a correct statement of the law. Government argued in that case, well, in its totality, the instructions were fine, just like the government argues in this case. The Court in Francis v. Franklin said, quote, nothing in these specific sentences or in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other. Language that merely contradicts and does not explain an infirm instruction will not suffice to absolve the infirmity. Now the government cites the Watkins case, which is a case from this circuit of this year, 2022, in a supplemental letter brief. But Watkins is distinguishable. One of the major points that's distinguishable in Watkins is that the 11th Circuit specifically noted in Watkins that the trial court had granted the defendant's request to give a theory of defense instruction. And the 11th Circuit said that theory of defense instruction clarified any consistency. Well, here you are, we didn't get that instruction. In fact, we asked for it, it was denied, and that's actually an error on appeal. But you're complaining about an instruction that's, you're saying that it is incorrect to say the term scheme to defraud means any plan or course of action intended to deceive or cheat. But then the court goes on to explain that to act with an intent to defraud means to act knowingly and with the specific intent to use false or fraudulent pretenses, representations, or promises to cause loss or injury. It goes on to further explain, so it's just one piece that you're complaining about. But again, we're looking at the whole picture and I just don't see how you get past the whole picture. I totally agree with you. Now, keep in mind that these were two different definitions. So the court defined scheme to defraud incorrectly using deceive or cheat. Then they moved on later in the same instruction to define intent to defraud, and I will give it to the district court, they defined that correctly. But I think the bottom line, Your Honor, is that it's inconsistent, contradicts one another, it clearly does by the definitions of those terms, and that's where we look at Francis B. Franklin. Do you think that he could have been convicted of mail and wire fraud if the jury only thought that he had deceived and not cheated? Why? Yes, because of that instruction. So that means to not get into all the facts, but an example in this case. Mr. Beck, there was an argument that he deceived GUA, which was his organization, his employer, by setting up these fake vendor relationships. That's deceit. But under the Takaloff decision, not only can you have deceit, you also have to have cheat, which is he intended to take money from GUA. The entire crux of Mr. Beck's defense, including the crux of his testimony, and I wasn't his trial counsel, but his trial counsel was in the courtroom today, was that while he may have deceived, he didn't cheat. And the evidence shows that. That was the crux of his entire testimony. That along the lines of the facts in the brief, which suggests that his main goal was to make the entity profitable. And, Your Honor, I know that people can question that, but that's obviously not what we can do here in the 11th Circuit. And here's what my main point is this. The jurors that have listened to Jim Beck say, I never intended to cheat. I never intended to take money. They could have believed him. And maybe we don't believe him in this courtroom, but that's not our job. The jury could have believed him and still convicted him if they looked at that scheme to defraud, which said deceive or cheat. And I understand that there was later language that was inconsistent, which is why I believe we go to Francis B. Franklin. And, Your Honor, because we have such little time, I think this is a very important issue. But unless you have more questions, I would like to move on to the next issue. But I will say that on this ground alone, we believe his conviction should be vacated and sent back for a new trial. Next, I'd like to talk about the search warrants. The issue here is whether the district court erred in denying Mr. Beck's motion to suppress the emails that Google sent in response to the second search warrant. This is subject to de novo review. As the court knows from the brief, there were two search warrants. The first one was constitutionally confirmed, and the government doesn't even argue otherwise. It was sent to Google, and it was really just what the case law calls a general warrant. It had no limitations, whatever. It had no temporal limitations. It was sent to Google. Google sends the documents back. Granted, and I'll talk about why I don't think this is relevant in a minute, the special agent, neither the special agent of the FBI or the prosecution team reviewed those emails. But why isn't that relevant? That seems to me to be the crux of the whole thing. Because the question is not whether they reviewed the emails. The question is whether special agent Dunn gleaned any information from the response to the constitutionally confirmed search warrant. Well, is there any evidence that he did? Yes, Your Honor. At the motion to suppress hearing, and we cite the transcript, pin down the briefs, he said two things. First, he acknowledged that before Google sent the response to the first warrant, he did not know for sure whether it was an active account and whether it currently had data in it. He also acknowledged that had Google come back in response to the first warrant and said, this account is closed, or we don't have any responsive data. Trial counsel asked him, special agent Dunn, had that happened, would you have sought a second warrant? He said no. But let me ask you this. If the search warrant, the first search warrant, had had a date restriction, would we be here arguing this issue today? Not this issue. Okay. So I guess I don't get how you move from they were going to issue, the government was going to issue a search warrant for emails over a certain date restriction. The first one was too broad, absolutely, and that information hasn't been reviewed. But they were going to issue the search warrant. It wasn't a situation where they gleaned that it's an active account. They were always going to be issuing a date-restricted search warrant. I respectfully push back, Your Honor, and say that while they didn't review the contents of the email, I don't think it's correct to say they didn't receive any information. Because the fact that Google sent data back, and again, this isn't my word, this is special agent Dunn in the motion to suppress hearing, said that gave him information. It may not have been the contents, but there's no case anywhere that says it has to be the contents. All of the cases say that in order for the independent source doctrine to apply, the maybe this was mostly independent, you know, whatever you want to say, but by definition, based on special agent Dunn's testimony alone, it wasn't wholly independent. But I guess that's not as if they issued the broad warrant in order to find out if he had an email account so that they could then issue the more appropriate warrant. I mean, that just doesn't make sense. It was sloppy, and they shouldn't have done it the way they did the first time. But did they really suspect that he didn't have an email address? With all respect, Your Honor, I don't think we could assume intent one way or the other. Of course, as a citizen of the United States, I would hope that the FBI agent didn't do that for that purpose. But I don't know. You know, the fact of the matter is they did do it, and they did glean information. Before you're running out of time, can I ask you a few questions about merger? Yes. Are you essentially making a Santos argument, or are you saying something different? We are saying that the government can charge money laundering as a receipt and deposit. There's no question about that. It's the way they charge the fraud scheme in this case. The fraud scheme included the deposits within it. It was actually a crucial part of the scheme. Would you say that's a Santos argument or a different kind of argument? I'll be honest with you, Your Honor, I am not familiar with a Santos argument. So I was trying to avoid that question. Okay. But I would cite, and I know obviously this is a Ninth Circuit case, so it's not binding precedent, but I would cite the US v. Van Alstyne case in the Ninth Circuit. It was really the exact same case. The defendant was convicted of money laundering and mail fraud for operating a Ponzi scheme. Part of that Ponzi scheme was taking money from new investors, writing a check to an old investor, and then mailing that check to the old investor to keep the Ponzi scheme going. The government argued that that was part of the scheme. They also argued that each check was a count of money laundering. He was convicted on both, and the Ninth Circuit said no. Because the mailing of the checks was not only a part of the alleged fraud scheme, but literally a central component of the alleged fraud scheme as it is here, you can't have both. Therefore, the money laundering charges merge into the fraud charges. Well, how do you get around our case in United States v. Silvestri, where this court says the specified unlawful activity was completed as soon as the investor checks were sent through the mails for the purpose of executing the fraudulent scheme. The subsequent depositing of the checks as proceeds of the specified unlawful activity of mail fraud satisfied the requirements of the money laundering counts. Absolutely. That is a correct statement of law. This isn't about what the law says. It's about how the government charged it. They could have charged it where the fraud scheme was done sometime before the deposits were made. They absolutely could have done that under binding precedent. But they didn't. They had a choice. Instead, they said part of the fraud scheme is the deposits. And under the indictment, the fraud scheme wasn't over until Mr. Beck took that check and deposited it into an account. So they could have done that, and then we wouldn't have had an argument. But they didn't, unless there's any questions. I do have one. Did you find any 11th Circuit case on the ethical question about the interviews?  And I think that's relevant because if I may comment, too, a rule says that in order for something to be authorized by law, there must be when applicable judicial precedent that either has found the activity permissible under this rule or has found this rule inapplicable. Even the government acknowledges this is a matter of first impression for the 11th Circuit. The only case that's decided here is the Doherty County State Court, which is down in Albany, Georgia. And the 11th Circuit said that state court decisions are not necessarily accurate statements of state law. So with that, Your Honor, I'd like to reserve the remainder of my time. Thank you. Thank you. You'll have three minutes when you get back up. Mr. Treanor. May it please the Court, I'm Will Treanor for the United States. Your Honor, I will follow the order of issues and start with the jury charge. As the Court points out, the court looks at jury charges as a whole. Mr. Banks argued that the definition of scheme to defraud is wrong. Our position is it's not. The court adjusted the circuit pattern after tackle-off. So it's a parallel construction intended to deceive someone out of money or property or intended to cheat someone out of money or property. That's a grammatical breakdown of that definition in the jury instruction. Also, Mr. Beck relies on the Miller case, which has always been curious. The Miller case is actually about the definition of intent to defraud. It's not about the court's definition of scheme to defraud. And the definition of intent to defraud given in this case certainly satisfies Miller. The one important thing about the Miller case is the defendant argued that the instructions were contradictory or confusing. And the court said, well, if they had been contradictory or confusing, the jury would have undoubtedly asked for further instruction. And in this case, the jury did not ask for further instruction. They deliberated for an hour and 40 minutes, came back, found Mr. Beck guilty of the charges. Can you really deceive someone out of money without cheating them, do you think? I think you might have a bigger problem with the instruction if it simply said deceive or cheat someone by using false or fraudulent pretenses. But to deceive or cheat someone out of money, do you think out of money applies? Do you think the jury would understand that cheat out of money or deceive out of money are both? Yes, Your Honor. Options. It's a straightforward parallel construction. And the evidence in this case was clearly all about Mr. Beck stealing money from Georgia Underwriting. In addition, in getting around the jury instructions, Mr. Beck himself testified. And he testified at length about Jerry Jordan and his team of software designers. And they're actually the ones who did all the work. And there's no evidence that Mr. Jordan exists or the software designers exist or anything was done. In his Jerry Jordan testimony, though, Mr. Beck explained he kept 10 to 20 percent of the money that was paid to CTEC, and he gave the rest to Jerry Jordan. So even under his Jerry Jordan testimony, Mr. Beck is taking money from Georgia Underwriting. And the jury could really disbelieve him and find it to be substantive evidence of his guilt, his story about Jerry Jordan. And the evidence of his guilt is so overwhelming, we would say if the court does find a problem with a jury instruction, any error was harmless. Well, could a jury conclude from the instruction that all the government needed to show was evidence of his deception and that it did not need to show evidence of harm? No, Your Honor. If they're told to instruct a jury twice, they had to find, as the court put it, proving intent alone without intent to cause loss or injury was not sufficient to find him guilty. I'm not sure, speaking only for myself, I'm not sure that I buy the entire argument about merger and money laundering. But one count stood out to me. Count 30 says that the money laundering count 30 corresponds to mail fraud count 19. But mail fraud count 19 was mailing a check sent on July 19, 2016, and money laundering count 30 is the July 19, 2016 deposit of the check. How is it possible that the check was both mailed and deposited on the same day? It's more of a proof problem than a merger problem. Yes, Your Honor. I thought that the merger, the whole merger argument presumes this relationship between the money laundering counts and the wire, and then the fraud counts as if a certain count nine is a predicate for some other count. And they're independent. There is no predicate relationship. I thought that the indictment actually connected them in some but not all of the cases. Am I wrong about that? I believe, Your Honor, it discharges the wire fraud, the mail fraud, and then the money laundering. And the jury has to find that the money laundering, the money was proceeds from wire fraud or mail fraud, and that Mr. Beck knew the money came from a criminal scheme. But they're not linked up. That's the whole—Mr. Beck is trying to impose this linkage on them, and it just doesn't exist. Under Mr. Beck's rule, he says in his reply argument that the entire scheme kind of merges, and there should be one money laundering count after a five-year scheme. But under Silvestri, every mailing completes the—or every wire completes the fraud, every check is proceeds, and when the deposit is more than $10,000, it's a 1957 violation. Your Honor, Judge Cohen told Mr. Beck's lawyers he didn't have any answer for Silvestri. He still doesn't. So that's what we think about the merger issue. Regarding search warrants, at the suppression hearing, the agent testified, and Judge Cohen found, right, that the agent got the warrant because—the second warrant, the September warrant, because he realized it needed a date limit on it. That was after the motion to suppress was filed. Yes, that alerted him, and based on his experience, he thought there would be something in there. Of course he did, because he had probable cause to search it. That's spelled out in the affidavit. Toward the end of the suppression hearing, the defense lawyer keeps asking him, he finally asks, what if Google had told you that there's nothing in the email account? Would you have applied for that second warrant? He said, I guess not. Well, if Google told him that, then he wouldn't have probable cause to search the warrant, the email account to begin with. But this Court's independent doctrine cases all look at what did the agents learn in the first, arguably, search that they used to get the warrant in the second search, and there's nothing in this case. And then finally, Judge Schlesinger, about your point, the parties really focused in the no contacts issue on whether there was a violation. But there is one very important 11th Circuit case that Judge Cohen put in his order at the end. He decided, United States v. Lowry, that this Court has held that a violation of a disciplinary rule is not a basis to suppress evidence. Suppression is a remedy of a last resort for a constitutional violation. And the last line of Rule 4.2 says, the rule imposes ethical restrictions that go beyond those imposed by the Constitution. But you're not conceding there was a violation of a disciplinary rule. Well, I just like Lowry, but the parties really focused on the violation in Lowry the Court held that the federal rules of evidence control the admissibility of evidence in federal courts. Federal Rule 4.2 says all relevant evidence comes in unless it's a violation of a Constitution, federal statute, the rules of evidence, or a Supreme Court rule. This Court held a disciplinary rule does not qualify under 4.2, so suppression is not the remedy. So that's the only 11th Circuit case. I'd like to return briefly. I've got the indictment in front of me, and this may not matter because I don't know that Mr. Beck has made this argument. But Count 19 says that on July 19, 2016, bar fraud occurred when USPS mail enclosing a check in the amount of $22,441.86. And then the money laundering, Count 30, says that on July 19, 2016, there was a $22,441.86 deposit, and the same companies are listed on both. So that seems to me to say pretty clearly, to tie those two counts pretty clearly together. I'm just having a hard time understanding, maybe I just don't know enough about modern banking, how a check could be mailed and deposited on the same day. I can't answer that. I can tell you there's no finding Mr. Beck guilty of Count 30 doesn't depend on finding him guilty of Count 19. Okay. Yeah, I agree. It's not, like I said, more of a proof problem. But again, maybe I didn't raise that. So, all right, thanks. If the panel has further questions, you can respectfully ask Mr. Beck's conviction and sentence to be affirmed. Thank you. Thank you. All right, Mr. Grubman. Yes. Just going back to, if it pleases the Court, going back to the search warrant argument, I wasn't able to get into the harmless error review. I think one of the government's arguments in their briefs was that even if there was a Fourth Amendment violation, the error was harmless. We would argue that it was far from harmless, Your Honors. Just one of the emails that were produced pursuant to the second warrant by Google was introduced by the government at trial as Exhibit 450. And then in closing argument, the government referenced that document six times, and not only referenced it but called it, quote, the smoking gun. And therefore, of course, we believe that it is far from harmless. I'd also like to, you know, the government argues that there was no violation because they didn't see the contents. And I know we talked about that a little. But I'd also like to cite a case that we cite in our briefs, the Silverthorn Lumber case. It's a very old case from the Supreme Court. It goes back to 1920, which I would, of course, argue makes it even better. It's been around 102 years. And it says, quote, the essence of the provision forbidding acquisition of evidence in a certain way is not merely the evidence so required shall not be used before the court, but that shall not be used at all. In the second search warrant affidavit, the affiant, Special Agent Dunn, told the magistrate judge that there was a first warrant. So the magistrate judge knew this. The magistrate judge also knew that in response to the first warrant, there was data that was produced. Did they know what that data said? No. But they knew the data was produced. And therefore, Your Honors, I would just go back to what I said, is the test is wholly independent. You know, whether or not we like that test, that's the test. That's what all of the Supreme Court cases said. But so in the independent source doctrine, you would, applying it to this case, you would have to excise from the warrant anything that was learned from the first warrant. What in the second warrant was learned that has to be pulled out, and how does that change the probable cause analysis? So that's the Noriega case. Let's pull it out, and let's even say, Your Honor, that there's nothing to pull out. If there's nothing to pull out. But we'll still go to number two in the Noriega test, which then asks, was the officer's decision to seek the second warrant prompted by what he observed in response to the first? Now, I understand the government wants to do that prompted by, wants to view that very narrowly and say that means the contents. But that's not what the case law says. It simply says prompted by. And what we would argue is he did observe things in response to the first warrant. He observed two very important things. A, it was an active account, and he acknowledged he didn't know that before the first warrant response. And B, that it did have data responsive to his request. And he acknowledged he would not have sought the second warrant if it wasn't for that response. Therefore, Your Honors, by definition, it wasn't. Well, no. He said that if he had gotten a report that there was no data, he wouldn't have requested a second warrant. But isn't that saying, no, I wouldn't have wasted my time by requesting something that I knew I wouldn't get? That's another way of saying it. The way I would say it is it means it's not wholly independent. The word wholly means all. And there's clearly a connection, and he's clearly prompted by information he gleaned, whether or not it was the contents, from response to the first warrant. I see I'm out of time, Judges, so unless there are any questions, thank you. And thank you, Judge, for coming up from there. Thank you. We have your case under advisement. Thank you. Thank you. Thank you.